# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROBERT H. GRAHAM,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00001 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

*I. Background and Standard of Review*

Plaintiff, Robert H. Graham, ("Graham"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Graham protectively filed his application for DIB on October 30, 2018, alleging disability as of February 3, 2018, based on lumbosacral spondylosis; loss of his right eye; depression; hip pain; and inability to sit or walk for long periods of time. (Record, ("R."), at 10, 171-72, 198, 262.) The claim was denied initially and upon reconsideration. (R. at 106-08, 111, 116-18, 120-22.) Graham then requested a hearing before an administrative law judge, ("ALJ"). (R. at 123-24.) The ALJ held a hearing on July 6, 2020, at which Graham was represented by counsel. (R. at 34-68.)

By decision dated August 4, 2020, the ALJ denied Graham's claim. (R. at 10-22.) The ALJ found Graham meets the nondisability insured status requirements of the Act for DIB purposes through September 30, 2024. (R. at 12.) The ALJ found Graham had not engaged in substantial gainful activity since February 3, 2018,[2] the alleged onset date. (R. at 12.) The ALJ determined Graham had severe impairments, namely lumbar degenerative disc disease, loss of vision in the right eye, obesity, generalized anxiety disorder and major depressive disorder, but he found Graham did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[2] Therefore, Graham must show he was disabled between February 3, 2018, the alleged onset date, and August 4, 2020, the date of the ALJ's decision, to be eligible for benefits.

(R. at 12-15.) The ALJ found Graham had the residual functional capacity to perform light work,[3] except he could occasionally perform postural activities and twisting, but could not climb ladders, ropes and scaffolds; he could frequently reach; he must avoid concentrated exposure to cold temperatures, vibrations and humidity; he must avoid exposure to industrial hazards; he could understand, remember and carry out simple instructions and perform simple tasks; he could have occasional interaction with others; and he would be off task 15 percent of the workday. (R. at 15.) The ALJ acknowledged that, due to the loss of his right eye, Graham had no near or far visual acuity, depth perception, accommodation, color vision or field of vision of the right eye. (R. at 15.) The ALJ found Graham was unable to perform any of his past work. (R. at 20.) Based on Graham's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Graham could perform, including the job of a hand packager, a laundry worker and a cleaner/maid. (R. at 20-21, 58-60.) Thus, the ALJ concluded Graham was not under a disability as defined by the Act from February 3, 2018, through the date of the decision, and he was not eligible for DIB benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Graham pursued his administrative appeals, (R. at 162-64, 290-92), but the Appeals Council denied his request for review. (R. at 1-5.) Graham then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Graham's motion for summary

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

judgment filed July 22, 2021, and the Commissioner's motion for summary judgment filed October 22, 2021.

## II. Facts

Graham was born in 1976, (R. at 39, 171), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Graham has a high school education and past work experience as a heavy equipment operator and heavy equipment mechanic. (R. at 39, 58.) On February 3, 2018, Graham sustained a work-related injury to his lower back, left lower extremity and left shoulder. (R. at 40.) On August 22, 2018, Graham sustained a right eye injury while target shooting and subsequently lost his right eye. (R. at 41-42, 361-62.) Graham reported he was able to perform household chores, including preparing meals, light laundry and shopping; he could ride a lawn mower and drive a car; he attended church and his son's ballgames; he drove his son to school up to four days a week; he visited with family and friends; and he walked for exercise. (R. at 211, 216, 222, 226, 944.) Graham stated he could follow simple instructions; he could follow spoken instructions after having them repeated; he could get along "very well" with authority figures; and he could handle stress "very well," but had difficulty handling changes in routine. (R. at 217-18, 228.)

In rendering his decision, the ALJ reviewed records from Dr. Andrew Bockner, M.D., a state agency physician; Dr. Bert Spetzler, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Dr. William M. Platt, M.D.; Indian Path Medical Center; Pain Medicine Associates; Stone Mountain Health Services, ("Stone Mountain"); East Tennessee Brain & Spine Center, ("Brain & Spine Center"); Dr. John S. Litton, M.D.; Johnson City Eye Clinic; Dermatology Associates; Holston

Medical Group Rehabilitation Services; Johnson City Medical Center; Appalachian Rehabilitation Professionals; Arthur W. Stair, III, M.A., a licensed senior psychological examiner; Dr. Gregory Corradino; and Wellmont Medical Associates.

From February 2018 through April 2020, Dr. John S. Litton, M.D., treated Graham for low back pain stemming from his February 3, 2018, work-related injury.[4] On February 6, 2018, Graham had decreased strength in his left lower extremity; decreased reflexes in the left knee; and hypoesthesia at the L2-L3 level distribution on the left side.[5] (R. at 616-17.) On February 22, 2018, an MRI of Graham's lumbar spine showed degenerative disc disease at the L4-L5 level with evidence of left-sided nerve root impingement. (R. at 894-95.) Dr. Litton's subsequent examinations routinely showed Graham was well-groomed; he was in mild to moderate pain; his gait was affected by a left leg limp; his quadricep tone and strength was 4/5 on the left and 5/5 on the right; he had decreased range of back flexion, extension and lateral flexion; he was neurologically intact; he had hypoesthesia in the left L2-L3 distribution; he was fully oriented; his affect and demeanor were appropriate; and his recent and remote memory were intact. (R. at 561, 565, 569, 573, 580, 584, 587, 594, 597-98, 601, 604, 607-08, 817, 821, 829, 838, 842, 846, 851, 915.) Dr. Litton repeatedly stated Graham was not able to resume working and recommended he use his TENS unit; alternate cold packs and moist

---

[4] During this time, Graham underwent interlaminar epidural steroid injections, medial branch blocks, radiofrequency ablations and physical therapy. (R. at 294, 306, 312-59, 454-55, 458-61, 490.) Following an epidural steroid injection on March 16, 2018, Graham was advised to perform light activity for 24 hours before resuming normal activities. (R. at 303.) During a follow-up call the following day, Graham voiced no complaints and stated he was at the park walking. (R. at 305.) In May 2018, Graham participated in physical therapy on three occasions. (R. at 345, 347, 351.) He was discharged on July 9, 2018, for failing to return after May 11, 2018. (R. at 357.)

[5] On September 24, 2019, Dr. Litton prescribed a cane. (R. at 839.)

heat; massage; home back strengthening exercises; and weight loss. (R. at 565, 569, 580, 594, 601, 604, 608, 617, 813, 839, 852, 916.)

On March 9, 2018, Dr. William M. Platt, M.D., saw Graham at the request of Dr. Litton. (R. at 897-99.) Graham was in no acute distress; he had functional range of motion in the upper and lower extremities; he could flex his back 40 to 50 degrees before experiencing pain; straight leg raising tests were negative on the right and somewhat positive on the left, but no true sciatica; reflexes were dampened at the left patella; and he had normal strength and sensation. (R. at 898.) Dr. Platt diagnosed lumbosacral spondylosis, lumbar disc displacement and sciatica. (R. at 898.) An epidural steroid injection was scheduled. (R. at 899.) Dr. Platt noted no changes in Graham's activity restrictions. (R. at 900.) On April 9, 2018, Dr. Platt reported Graham was able to stand from a sitting position and he ambulated with a slightly antalgic gait. (R. at 896.) Graham reported no benefit from recent lumbar epidural steroid injection. (R. at 896.) Graham reported his pain level was one-to-two on a scale of one-to-10. (R. at 896.)

On April 30, 2018, and May 11, 2018, Graham saw Dr. Litton and reported back pain; left leg pain; left lower extremity paresthesia and weakness; hypersomnia; anxiety and stress. (R. at 599, 602.) Dr. Litton diagnosed lumbar radiculopathy and generalized anxiety disorder. (R. at 604.) Dr. Litton's examination findings remained unchanged. (R. at 598, 601.)

On June 4, 2018, Graham was referred to D. Mirle R. Girish, M.D., a physician at Indian Path Medical Center, for a sleep evaluation. (R. at 395-97.) Graham was alert and oriented; he was in no acute distress; he had good air entry bilaterally; his oropharynx showed crowding; his breath sounds were clear

bilaterally; he had no cyanosis, clubbing or edema in his extremities; he had a normal gait and station; he was neurologically intact; and his thought, judgment and affect were normal. (R. at 396.) An at-home sleep study was ordered, which showed obstructive sleep apnea syndrome and essential hypertension. (R. at 389-90, 396.)

On June 8, 2018, Wes Perry, PA-C, a physician's assistant at Brain & Spine Center, saw Graham for his complaints of back and left leg pain. (R. at 466-68.) Graham reported his left leg pain extended from the buttock down the lateral aspect of the left leg to the knee and occasional tingling in the bottom of his foot. (R. at 467.) Graham stated he used a TENS unit and heat, which helped his back pain.[6] (R. at 467.) Graham was cooperative and in no distress; his gait pattern was fairly normal, but he slightly favored a forward flexed posture when he walked; his range of motion was very poor in extension; his straight leg raising tests produced back pain but were not truly positive; he had generalized tenderness at the lumbosacral junction; his motor strength was intact; and he had normal hip rotation.[7] (R. at 467.) Perry diagnosed low back pain; degeneration of lumbar intervertebral disc; prolapsed lumbar intervertebral disc; and lumbosacral spondylosis without myelopathy. (R. at 468.) Perry recommended medial branch blocks since Graham did not have success with epidural injections and physical therapy.[8] (R. at 467.)

---

[6] At subsequent visits, Graham continued to report his back pain was relieved with the use of a TENS unit, heat and rest. (R. at 438, 904.)

[7] Graham's examination findings remained unchanged during subsequent office visits. (R. at 440, 444, 448, 906.)

[8] On July 27, 2018, and August 10, 2018, Graham underwent a lumbar medial branch block. (R. at 454-55, 458-61.)

On July 30, 2018, Graham saw Patricia Erwin, N.P., a nurse practitioner with the Brain & Spine Center, and reported his recent medial branch block provided more leg pain relief than back pain relief. (R. at 446.) Graham stated he was very active following the procedure and worked with a chainsaw, which increased his pain "some" but overall, he maintained pain relief and wished to proceed with a second medial branch block. (R. at 446.) He denied joint stiffness, swelling and pain; hip pain; limitation in range of motion; decrease in strength; muscle cramps and pain; limb pain and swelling; gait abnormality; difficulties with activities of daily living; difficulty exercising; neurological symptoms; anxiety; and depression.[9] (R. at 446.) Erwin diagnosed lumbosacral spondylosis without myelopathy; low back pain; left lower extremity pain; and lumbar disc narrowing. (R. at 448.)

On August 22, 2018, Graham was admitted to Indian Path Medical Center after sustaining an injury to his right eye while target shooting. (R. at 361-88.) He was transported to Johnson City Medical Center where he underwent removal of a small metallic object lodged into his right nasal bridge. (R. at 378, 388, 407-21.) Graham subsequently had his right eye removed and replaced with a glass prosthetic. (R. at 772.) On October 3, 2018, Dr. Peter A. Lemkin, O.D., an optometrist with Johnson City Eye Clinic, reported Graham had 20/20 vision in his left eye. (R. at 767.) Graham denied pain but stated he experienced flashes of light two to three times a week. (R. at 766.)

---

[9] At subsequent visits, Graham routinely denied these symptoms, (R. at 438-39), except on September 3, 2018, he reported left hip pain; pain in his buttocks; joint pain; lower back pain; limited range of motion; weakness; left limb pain; gait abnormality; difficulty performing activities of daily living; difficulty exercising; left foot tingling, numbness and weakness; anxiety; and depression. (R. at 442-43.) Erwin ordered a bilateral lumbar radiofrequency ablation, which was performed on October 24, 2018. (R. at 445, 451-52.)

On October 12, 2018, Dr. Sameh Ward, M.D., a physician with Pain Medicine Associates, evaluated Graham for his lumbar spine injury. (R. at 426-28.) Graham denied leg pain, tingling and numbness and he stated his lower extremities did not give way under him. (R. at 426.) It was noted Graham had responded well to lumbar facet injections. (R. at 426-27.) Upon examination, Graham's lumbar spine range of motion was limited; he had lumbar facet tenderness; he had intact sensation; his right lower extremity examination was normal; and his deep tendon reflexes, gait and coordination were normal; he was fully oriented; his mood and affect were well-adjusted, pleasant and cooperative; he had appropriate judgment and insight; his recent and remote memory were appropriate. (R. at 426-27.) Dr. Ward diagnosed bilateral, lumbar facet joint syndrome; spondylosis of the lumbar region; and intervertebral disc disorders in the lumbar region. (R. at 427-28.)

On November 20, 2018, Graham saw Adam Smith, Psy.D., a psychologist at Stone Mountain, stating he was depressed and having difficulty adjusting to being disabled and unemployed. (R. at 435-37.) He reported difficulty sleeping and his appetite was normal, but he might be "drinking too much." (R. at 435.) Smith reported Graham was fully oriented; he was appropriately dressed and groomed; he engaged during the session; his mood and affect were depressed and anxious; and he denied suicidal and homicidal ideations. (R. at 435.) Smith diagnosed adjustment disorder with mixed anxiety and depressed mood. (R. at 436.) On November 27, 2018, Graham stated he was doing much better overall. (R. at 433.) He stated he was coping "very well" with stress. (R. at 433.) Graham stated he stayed busy most days with coloring, performing housework, working in his workshop and recently having lunch with his friends. (R. at 433.) He reported counseling had been beneficial. (R. at 433.) Graham stated he felt "good for now" and did not believe he needed regular

appointments but would return as needed. (R. at 433.) Smith's examination findings remained unchanged except Graham's mood and affect were euthymic. (R. at 433.)

On November 29, 2018, Graham saw Allison Raettig, N.P., a nurse practitioner with the Brain & Spine Center, and reported his recent bilateral radiofrequency ablation helped with his pain and tingling in his left foot but he continued to experience low back and left hip pain. (R. at 438.) Graham rated his current pain level at one-to-two on a scale of one-to-10 with his lowest pain level over the past month being one-to-two and his highest being five-to-six. (R. at 438.) He stated his pain was aggravated by sitting, standing, bending and lifting. (R. at 438.) Raettig diagnosed chronic pain syndrome, lumbar disc narrowing and lumbosacral spondylosis without myelopathy. (R. at 440.)

On December 17, 2018, Graham saw Dr. Litton for hypertension. (R. at 571.) Dr. Litton noted Graham had poor compliance with treatment as he did not follow a diet and exercise program. (R. at 571.) Dr. Litton recommended Graham reduce alcohol consumption, exercise, reduce dietary salt intake, lose weight and reduce stress. (R. at 573.)

On January 29, 2019, Graham was seen by Bailey Qualls, P.A., a physician's assistant at the Brain & Spine Center, for low back pain. (R. at 901.) Graham reported 80 percent lumbar sacral pain that is worse with extension and 20 percent of his pain radiating into the left hip and lateral thigh to the knee. (R. at 901.) He stated standing was his worst position. (R. at 901.) Graham had a slightly antalgic gait limping favoring the left leg; he had pain with extension; he had no tenderness to palpation in the thoracolumbar spine; his motor function was intact in the lower

extremities; and he had intact sensation. (R. at 902.) Graham was diagnosed with low back pain and lumbar spondylosis. (R. at 902.)

On February 20, 2019, Graham underwent a functional capacity evaluation[10] at Holston Medical Group Rehabilitation Services. (R. at 475-80.) Graham rated his pain level at three in the lower back region with the worst being at seven. (R. at 476.) He stated he will drink beer, take ibuprofen[11] and use his TENS unit for pain relief. (R. at 476.) The evaluation established that Graham could perform medium[12] work, as he was able to exert 45 to 50 pounds of force occasionally, 22.5 to 25 pounds frequently and up to 11.25 to 12.5 pounds of force constantly to move objects. (R. at 479.) Graham could carry items weighing up to 45 pounds and occasionally push and pull up to 80 pounds. (R. at 479.) His musculoskeletal findings demonstrated minor trunk range of motion deficits and some minor strength deficits in his lower extremities. (R. at 479.) Graham demonstrated 5/5 muscle strength in both lower extremities, except for bilateral hip flexors at 4+/5 and ham strings 4+/5; he demonstrated 5/5 muscle strength in both upper extremities; and he had a slight antalgic gait on the left but used no assistive devices. (R. at 476.) Graham was encouraged to continue home exercises and participate in a walking program. (R. at 479.) Alan Meade, P.T., a physical therapist, ("A. Meade"), reported Graham had rehabilitative potential and could possibly return to work; however, he could not

---

[10] On February 26, 2019, Dr. Gregory Corradino stated he agreed with the functional capacity assessment. (R. at 489.) He reported Graham had reached maximum medical improvement and his restrictions were permanent. (R. at 489.) Dr. Corradino gave Graham a nine percent impairment rating. (R. at 489.)

[11] Graham reported his medications included Lisinopril, baby aspirin, ibuprofen and vitamins. (R. at 476.)

[12] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2021).

safely return to work with his normal job requirements. (R. at 479.) A. Meade opined Graham could occasionally climb stairs and ladders, crawl, kneel, repetitively squat, repetitively bend and twist. (R. at 478.) He found Graham could sit up to five and one-half hours total; stand up to two hours; and walk a mile or more a day but could do so for only 15 minutes without interruption. (R. at 478.)

On February 26, 2019, Dr. Litton completed a Physician's Report for the Virginia Retirement System. (R. at 483-86.) He found Graham had lumbar disc herniation, which caused back pain and leg numbness; blindness in the right eye; and he was unable to perform work duties. (R. at 483.) Dr. Litton diagnosed lumbar disc herniation, right eye blindness and lumbosacral spondylosis. (R. at 483.) He found Graham's disabling conditions to be permanent. (R. at 484.) That same day, Richard Maupin, P.A., a physician's assistant with the Brain & Spine Center, reported Graham had a slightly antalgic gait favoring the left leg; he had pain with extension; he had no tenderness to palpation in the thoracolumbar spine; he had mild weakness in his quadriceps on the left; and he had intact sensation and reflexes. (R. at 492.) Maupin opined Graham was at maximum medical improvement and rated his permanent impairment at nine percent. (R. at 492.) Maupin agreed with the permanent restrictions as found in the functional capacity assessment. (R. at 492.) He stated he agreed with the functional capacity evaluation determination that Graham was capable of employment in a different role. (R. at 492.)

On March 7, 2019, Dr. Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), finding Graham had mild limitations in his ability to understand, remember or apply information; to interact with others; and to concentrate, persist or maintain pace and no limitations in his ability to adapt or manage himself. (R. at 75-76.) On July 24, 2019, Joseph

Leizer, Ph.D., a state agency psychologist, completed a PRTF, which mirrored that of Dr. Bockner. (R. at 95-96.)

On March 8, 2019, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding Graham could perform light work. (R. at 78-80.) He found Graham could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs; and occasionally climb ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 78-79.) Dr. Spetzler found Graham had no right eye, which limited his near and far acuity, depth perception, accommodation, color vision and field of vision, but he had 20/20 vision in the left eye; and he should avoid moderate exposure to hazards, such as machinery and heights. (R. at 79-80.) He opined Graham had no manipulative or communicative limitations. (R. at 79.) On September 25, 2019, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. Spetzler, except he found Graham should avoid concentrated exposure to extreme cold, humidity and vibration. (R. at 98-100.)

On April 11, 2019, Dr. Litton noted Graham was doing "fairly well" and he was using ibuprofen and Tylenol for pain control. (R. at 561.) Dr. Litton opined Graham was unable to return to work due to medical problems, particularly noting right eye blindness. (R. at 561.)

On April 16, 2019, Graham saw Dr. Lemkin, reporting floaters in his left eye. (R. at 760-65.) Graham denied dizziness, gait disturbance, headaches and emotional changes. (R. at 761.) Examination of Graham's left pupil revealed it was equal, round and reactive with no afferent pupillary defect; his extraocular movement was

-13-

full; his iris and cornea were normal; he had a clear lens capsule, cortex and nucleus; he had no hemorrhages, exudates, pigmentary changes or macular edema; and he had 20/20 vision. (R. at 762.) Dr. Lemkin also reported Graham's mood and affect were normal and he was fully oriented. (R. at 762.) Dr. Lemkin diagnosed history of enucleation of the right eyeball and posterior vitreous detachment of the left eye. (R. at 763.) On October 17, 2019, Graham was seen for follow up of posterior vitreous detachment, ("PVD"), in the left eye. (R. at 908.) His distance vision acuity was clear and stable, and his near vision acuity was worsening. (R. at 908.) Graham reported his floaters had worsened. (R. at 908.) Examination of Graham's left pupil revealed it was equal, round and reactive with no afferent pupillary defect; his extraocular movement was full; his iris and cornea were normal; he had a clear lens capsule, cortex and nucleus; he had no hemorrhages, exudates, pigmentary changes or macular edema; and his vision was 20/25. (R. at 909-10.) Dr. Lemkin also reported Graham's mood and affect were normal and he was fully oriented. (R. at 910.)

On January 6, 2020, despite Graham's denial of anxiety, depression and sleep disturbances, Dr. Litton diagnosed generalized anxiety disorder. (R. at 819, 821.) On March 10, 2020, Graham complained of worsening low back and leg pain. (R. at 815.) Dr. Litton ordered x-rays of Graham's left knee and an MRI of his lumbar spine. (R. at 817.) On March 24, 2020, an MRI of Graham's lumbar spine showed a broad-based disc bulge and concentric annular tear at the L4-L5 level, with mild central spinal canal stenosis and mild bilateral lateral recess stenosis; and mild disc bulging and small central annular tear at the L3-L4 level. (R. at 883-84.) That same day, x-rays of Graham's left knee showed very mild osteoarthritis. (R. at 886.) During a telemedicine visit on March 25, 2020, Dr. Litton reported Graham appeared alert and fully oriented and he was visibly in pain. (R. at 813.) Dr. Litton diagnosed

other intervertebral disc displacement, lumbar region and reported Graham was not able to resume working (R. at 813.)

On June 4, 2020, Dr. Paul L. Jett, M.D., a physician with Wellmont Medical Associates, evaluated Graham for his complaints of chronic back pain and stiffness. (R. at 942-48.) Graham was fully oriented; his lumbar back exhibited decreased range of motion and tenderness; his lower extremities had no deformity or edema; his gait was normal; his reflexes were 1+ in his bilateral lower extremities; his back had abnormal range of motion; he had full muscle strength; his straight leg raising tests were negative on the right and positive on the left; his motor examination was normal; he had normal sensation; and his mood, affect, behavior, judgment and thought content were normal. (R. at 946-48.) Dr. Jett diagnosed lumbar radiculopathy; facet degeneration of the lumbosacral region; and degeneration of the lumbar intervertebral disc. (R. at 948.) Dr. Jett scheduled an epidural steroid injection. (R. at 948.)

On June 22, 2020, Arthur W. Stair, III, M.A., a licensed senior psychological examiner, evaluated Graham at the request of his attorney. (R. at 927-33.) Graham had good hygiene and grooming; his balance, gait and posture were compromised, and he stumbled coming into the office, almost falling; he was fully oriented; he demonstrated a slightly below average ability to think abstractly; he easily answered simple logic-based problems; he performed poorly on the serial 7s task, as he made mistakes from being notably anxious; his short-term memory was intact; his thinking pattern was somewhat scattered; he had difficulty maintaining a logical and coherent train of thought; his affect was appropriate, aside from being overtly anxious; he exhibited no unusual or bizarre behaviors or mannerisms; his attention span was fair to poor; his speech was normal; and he made good eye contact. (R. at 927, 929-30.)

Graham stated he avoided being around people, including family members. (R. at 929.) After reviewing Graham's medical records, Stair noted Graham was diagnosed with an adjustment disorder with mixed anxiety and depressed mood on November 8, 2018, shortly after his gunshot accident; on December 19, 2019, Dr. Miles noted a history of depression and anxiety; and on March 24, 2020, Dr. Litton diagnosed generalized anxiety disorder. (R. at 931.) Stair opined Dr. Litton's diagnosis demonstrated Graham's anxiety had persisted and significantly worsened since 2018. (R. at 931-32.) Stair stated these medical opinions were consistent with his observations and with Graham's reported symptomatology. (R. at 932.) He also stated Graham's depression had persisted and significantly worsened since the two accidents and the loss of his job. (R. at 932.)

The Personality Assessment Inventory, ("PAI"), test was administered, which indicated Graham was moderately depressed, anxious and agitated. (R. at 932.) Stair diagnosed major depressive disorder, recurrent, moderate to severe and generalized anxiety disorder, moderate, with mild panic and post-traumatic stress features. (R. at 933.) Stair opined Graham's ability to understand simple information or directions was mildly impaired; his ability to comprehend and implement multi-step complex instructions was moderately impaired; his abilities to maintain persistence and concentration and to adapt to changes in the workplace were markedly impaired; and his ability to interact socially was moderately to markedly impaired. (R. at 932-33.)

On June 24, 2020, Stair completed a mental assessment, indicating Graham had slight limitations in his ability to follow work rules; to understand, remember and carry out simple and detailed job instructions; and to maintain personal appearance. (R. at 934-36.) He found Graham had serious limitations, resulting in an unsatisfactory work performance, in his ability to relate to co-workers; to deal

with the public; to use judgment in public; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 934-35.) Stair found Graham had no useful ability deal with work stresses and to demonstrate reliability, and he would be absent from work more than two days a month. (R. at 934-36.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715

F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Graham argues the ALJ erred by improperly determining his residual functional capacity by failing to properly consider the opinions of Dr. Litton, Meade and Stair and by giving controlling weight to the opinions of the state agency consultants. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Graham contends the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368

(Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[13]

Instead, an ALJ must consider and articulate how *persuasive* she finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or

---

[13] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2021).

prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2021).[14] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how she considered each of them. Instead, when articulating her finding about whether an opinion is persuasive, the ALJ need only explain how she considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2021).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature

---

[14] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found Graham had the residual functional capacity to perform light work, except he could occasionally perform postural activities and twisting, but could not climb ladders, ropes and scaffolds; he could frequently reach; he must avoid concentrated exposure to cold temperatures, vibrations and humidity; he must avoid exposure to industrial hazards; he could understand, remember and carry out simple instructions and perform simple tasks; he could have occasional interaction with others; and he would be off task 15 percent of the workday. (R. at 15.) The ALJ acknowledged that, due to the loss of his right eye, Graham had no near or far visual acuity, depth perception, accommodation, color vision or field of vision of the right eye.[15] (R. at 15.)

In making his residual functional capacity finding, the ALJ found Dr. Litton's treatment notes and his February 2019 opinion that Graham was unable to perform work duties "not persuasive" because he failed to provide any specific work limitations and his records did not indicate whether he reviewed Graham's functional capacity evaluation report. (R. at 19.) As noted by the ALJ, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2021); *see also* 20 C.F.R. § 404.1527(d)(2) (2021) (a

---

[15] As noted by the ALJ, while Graham had no vision in his right eye, examination notes indicated he had 20/25 vision in his left eye with no evidence of retinopathy. (R. at 17.) The ALJ accommodated the loss of Graham's right eye vision in his residual functional capacity finding and in his hypothetical to the vocational expert. (R. at 15, 17, 58-59.)

claimant's residual functional capacity is an issue reserved exclusively to the Commissioner).

Dr. Litton treated Graham from February 2018 through April 2020 for low back pain stemming from his February 3, 2018, work-related injury. During this time, Dr. Litton's examinations routinely showed Graham was well-groomed; he was in mild to moderate pain; his gait was affected by a left leg limp; his quadricep tone and strength was 4/5 on the left and 5/5 on the right; he had decreased range of back flexion, extension and lateral flexion; he was neurologically intact; he had hypoesthesia in the left L2-L3 distribution; he was fully oriented; his affect and demeanor were appropriate; and his recent and remote memory were intact.[16] In March 2020, after complaining of worsening low back and leg pain, Dr. Litton ordered x-rays of Graham's left knee and an MRI of his lumbar spine. The MRI of Graham's lumbar spine showed a broad-based disc bulge and concentric annular tear at the L4-L5 level, with mild central spinal canal stenosis and mild bilateral lateral recess stenosis; and mild disc bulging and small central annular tear at the L3-L4 level and x-rays of Graham's left knee showed very mild osteoarthritis.

Examining physicians regularly reported that Graham had a slightly antalgic to normal gait; he had functional range of motion in his upper and lower extremities; he had normal strength and sensation; he had no cyanosis, clubbing or edema in his extremities; and he was neurologically intact. Graham rated his pain level at one-to-two and stated he used ibuprofen and Tylenol for pain control. He routinely reported the use of his TENS unit and heat helped his back pain. "If a symptom can be

---

[16] As noted by the ALJ, Dr. Litton's examination findings did not change over a two-year period, which suggested his findings were cut and pasted from visit to visit. (R. at 17.)

reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ also found A. Meade's functional capacity evaluation assessment "partially persuasive." (R. at 19.) A. Meade found Graham could perform medium work that allowed only occasionally climbing of stairs and ladders, crawling, kneeling, repetitive squatting, bending and twisting. He also found Graham could sit up to five and one-half hours total; stand up to two hours; and walk a mile or more a day but could do so for only 15 minutes without interruption. A. Meade found Graham had active range of motion in both the upper and lower extremities; he had full muscle strength in both lower extremities except for bilateral hip flexors and hamstrings at 4+/5; he had full muscle strength in both upper extremities; his trunk flexion, extension and lateral trunk flexion were 5/5 with normal trunk balance and stability; his sensation was intact; and he demonstrated an antalgic gait to the left side but used no assistive devices.[17] The ALJ stated A. Meade's limitations in sitting, standing and walking appeared to be based heavily on Graham's subjective reports and were inconsistent with the medical evidence. (R. at 19.)

The ALJ found Maupin and T. Meade's opinion that, while Graham would be unable to perform his prior work duties, he could return to some form of employment "persuasive" because it was consistent with Graham's routine and conservative treatment records. (R. at 19.) However, he found their nine percent disability rating "not persuasive" because it was based upon worker's compensations standards, which provides for partial disability findings. (R. at 19.) The ALJ found the state agency physicians' assessments "partially persuasive." (R. at 19.) While the state

---

[17] The ALJ noted that Dr. Litton prescribed Graham a cane in September 2020, but he did not use an assistive device during the functional capacity evaluation. (R. at 17.)

agency physicians found Graham could do a limited range of light work, the ALJ found Graham's complaints of consistent low back pain and examination findings of reduced lumbar range of motion supported additional reaching and postural limitations as found in his residual functional capacity finding. (R. at 19.)

As noted above, the ALJ found Stair's opinion "not persuasive" and "not consistent" with the overall evidence. (R. at 19-20.) In June 2020, Stair opined Graham had serious limitations, resulting in an unsatisfactory work performance in his ability to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. Stair also found Graham had no useful ability deal with work stresses and to demonstrate reliability, and he would be absent from work more than two days a month.

Graham first saw psychologist Smith on November 20, 2018, who diagnosed him with an adjustment disorder with mixed anxiety and depressed mood. Psychologist Smith found that Graham was fully oriented; he engaged during the session; his mood and affect were depressed and anxious; and he denied suicidal and homicidal ideations. On November 27, 2018, approximately one week later, Graham stated he was doing much better overall. He stated he was coping "very well" with stress and stated he stayed busy most days with coloring, performing housework, working in his workshop and recently having lunch with his friends. He reported counseling had been beneficial and stated he felt "good for now" and did not believe he needed regular appointments but would return as needed. *See Gross,* 785 F.2d at 1166.

As noted by the ALJ, subsequent mental health treatment was limited to psychotropic medication management by Dr. Litton, who routinely reported Graham was fully oriented; his affect and demeanor were appropriate; and his recent and remote memory were intact. The record also shows that, through January 2020, Graham regularly denied symptoms of anxiety and depression and examining physicians noted Graham was fully oriented; his mood, affect, behavior and thought content were normal; he had appropriate judgment and insight; and his recent and remote memory were appropriate.

The ALJ found the opinions of state agency psychologists Bockner and Leizer unpersuasive. (R. at 20.) The state agency psychologists found Graham had mild limitations in his ability to understand, remember or apply information; to interact with others; and to concentrate, persist or maintain pace and no limitations in his ability to adapt or manage himself. They also found that Graham's mental impairments were not severe. The ALJ noted that, while Graham received only limited mental health treatment during the period at issue, he was prescribed medications for depression and anxiety, which supported greater mental functional limitations as provided in his residual functional capacity finding. (R. at 20.)

In addition, the ALJ noted that Graham's activities of daily living were also inconsistent with his allegations of disabling pain and functional limitations. (R. at 18.) Graham reported he was able to perform household chores, including preparing meals, light laundry and shopping; he could ride a lawn mower and drive a car; he attended church and his son's ballgames; he drove his son to school up to four days a week; he visited with family and friends; and he walked for exercise. Graham stated he could follow simple instructions; he could follow spoken instructions after

having them repeated; he could get along "very well" with authority figures; and he could handle stress "very well," but had difficulty handling changes in routine.

Based on the above, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and her residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Graham was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Graham's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

**<u>Notice to Parties</u>**

Notice is hereby given to the parties of the provisions of 28 U.S.C. §
636(b)(1)(C):

> Within fourteen days after being served with a copy [of this
> Report and Recommendation], any party may serve and file written
> objections to such proposed findings and recommendations as provided
> by rules of court. A judge of the court shall make a de novo
> determination of those portions of the report or specified proposed
> findings or recommendations to which objection is made. A judge of
> the court may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge. The judge may also
> receive further evidence or recommit the matter to the magistrate judge
> with instructions.

Failure to file timely written objections to these proposed findings and
recommendations within 14 days could waive appellate review. At the conclusion
of the 14-day period, the Clerk is directed to transmit the record in this matter to the
Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and
Recommendation to all counsel of record at this time.

DATED:    June 17, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE